SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

### NL Industries, Inc. v. State of New Jersey (A-44-15) (076550)

**Argued October 26, 2016 -- Decided March 27, 2017**

**LaVecchia, J., writing for a majority of the Court.**

In this appeal, the Court determines whether the New Jersey Spill Compensation and Control Act (Spill Act), N.J.S.A. 58:10-23.11 to -23.24, retroactively abrogated the State's sovereign immunity for state action taken prior to the Act's 1977 effective date.

In September 1968, Sea-Land Development Corporation (Sea-Land) notified the State of its plans to protect Laurence Harbor from future erosion by the construction of a seawall, which would be made partly with "slag," an industrial byproduct. Sea-Land received a riparian land grant and building permit for the seawall, and completed the project during the early 1970s. During the construction, an Old Bridge Township official informed the NJDEP that slag was being dumped into Raritan Bay. At the time, the State acknowledged ownership of some of the land on which Sea-Land built the seawall; from the record, it does not appear that further action was taken at the time.

In 2007, the NJDEP detected contamination along the seawall in Laurence Harbor and reported its findings to the United States Environmental Protection Agency (EPA) in June 2008. In 2014, the EPA demanded that NL Industries, Inc. (NL), which had operated a factory in Perth Amboy that created slag as a byproduct, remediate the site based on the assertion that Sea-Land had obtained from NL slag used in the Laurence Harbor projects.

NL filed a complaint seeking contribution from the State under the Spill Act, alleging that the State caused or contributed to the Raritan Bay contamination in its roles as regulator and riparian landowner. The State filed a motion to dismiss based on: (1) sovereign immunity; (2) the immunities and procedural protections in the New Jersey Tort Claims Act (TCA), N.J.S.A. 59:1-1 to 12.3; and (3) NL's failure to state a claim.

The trial court denied the State's motion. 442 N.J. Super. 428 (Law Div. 2014). Combining the Spill Act's abrogation of sovereign immunity with its interpretation that this Court recognized a legislative intent that the Act be applied retroactively in Department of Environmental Protection v. Ventron Corp., 94 N.J. 473 (1983), the trial court concluded, first, that sovereign immunity for pre-Act discharges was waived. Second, the trial court found that the Spill Act and the TCA "were enacted at different times for demonstrably different reasons" and declined to graft onto the Spill Act the immunities and procedural protections of the TCA. Finally, the trial court rejected the State's argument that the complaint failed to state a claim.

On leave to appeal, the Appellate Division affirmed the denial of the motion substantially for the reasons set forth by the trial court. 442 N.J. Super. 403. The Court granted the State's motion for leave to appeal.

**HELD**: The Spill Act contains no clear expression of a legislative intent to waive the State's sovereign immunity retroactively to cover periods of State activity prior to the Spill Act's enactment. Therefore, the State's sovereign immunity prevails against Spill Act contribution claims based on State activities that occurred prior to the original effective date of that Act.

1. In 1976, the New Jersey Legislature enacted the Spill Act. From its origin, the Act provided that "any person" responsible for a discharge of a hazardous substance into State waters or onto lands leading to those waters "shall be strictly liable . . . for all cleanup and removal costs," and defined "any person" to include "the State of New Jersey." The inclusion of the State in the definition of "person" signaled the Legislature's clear intention to include the State as a party responsible for its hazardous discharges and the waiver of sovereign immunity. Significantly, the Act's definition of "person" as inclusive of the State has never been altered. (pp. 9-13)

2.  In 1979, the Legislature amended the Spill Act in several important ways.  The Legislature opened up the Fund's use for remediation of spills that occurred before the Spill Act was enacted and coupled that action with the expansion of NJDEP authority to seek contribution from non-public funding sources:  namely, parties in any way responsible for the discharge that the NJDEP removed or was removing.  In that pointed way, liability was expanded to permit the State to seek contribution from persons responsible for, among other discharges, those pre-Spill Act enactment discharges that the NJDEP chose to address.  In that manner, retroactivity found express authorization in the Act, but only under N.J.S.A. 58:10-23.11f(b)(3).  (pp. 14-18)

3.  It is debatable from the combination of amendments to the Act in 1991, and accompanying legislative statements, whether the change in the first sentence of N.J.S.A. 58:10-23.11g(c)(1)—to "no matter by whom incurred"— signaled a broadly intended opening-up of contribution actions against any and all dischargers, including the State, for hazardous discharges that preceded enactment of the Spill Act.  (pp. 18-20)

4.  It is an essential aspect of sovereignty to be free from suit by private citizens seeking money damages unless the State has given its consent, which requires a clear legislative expression of intent to be subject to suit.  A legislative waiver of sovereign immunity must be expressed clearly and unambiguously, and a retroactive waiver of sovereign immunity requires the clearest of expression.  (pp. 20-23)

5.  The inclusion of the State in the definition of "person" subject to the Act when first enacted did not render the State liable for any pre-enactment activities.  The Act, as originally passed, did not address discharges that predated enactment.  Although the Legislature did not subsequently alter the definition of "person" to exclude the State despite the amendment to permit private contribution actions for pre-Act discharges, that failure does not provide any convincing answer to the question of retroactive abrogation of sovereign immunity.  (p. 24)

6.  The question is not whether it is arguable that the Legislature passed an amendment that could be construed to provide a pathway to imposing liability on the State in a private contribution action based on the State's pre-Act activities; rather, the Court must be able to conclude that the Legislature clearly and unambiguously expressed its intention for that result to obtain.  The Court does not find the deliberate clarity necessary to reach that conclusion and therefore parts ways with the decisions reached by the trial court and Appellate Division.  (pp. 24-27)

7.  Ventron underscored the Court's awareness that the Act's retroactivity was conditioned—it pertained only to those pre-Act discharges that the State cleaned up and sought reimbursement for from private parties.  Far from supporting the position taken in this action, Ventron highlights the limited nature of the retroactivity permitted under the 1979 amendment.  Post-Ventron, other courts of this State have recognized that not all of the Act's provisions are intended to be retroactive.  (pp. 27-30)

8.  Amendments made to the Spill Act in 1993 do not shore up NL's position.  That the Legislature chose to add to the State's defenses for discharges on property that the State subsequently acquired does not address legislative intent regarding a retroactive stripping of the State's sovereign immunity for pre-1977 liability.  (pp. 30-31.)

9.  The trial court, affirmed by the Appellate Division, discerned no evidence that the Legislature intended to require the State's liability under the Spill Act to be harmonized with the procedural protections provided for claims under the TCA.  The Court agrees.  Further, in response to the State's argument that it should not be held liable when exercising its regulatory responsibilities or for its role as a sovereign, the Court finds no clear evidence that the Act was intended to strip the State of immunity for the discretionary governmental activities of a sovereign.  (pp. 31-33)

The judgment of the Appellate Division is **REVERSED**.  The matter is **REMANDED** to the trial court for further proceedings consistent with the holding of the Court.

**JUSTICE ALBLIN, DISSENTING**, expresses the view that, because there is no ambiguity about how the Legislature defined the term "person," there can be no doubt that the Legislature intended the Spill Act to apply retroactively to the State, and sovereign immunity is a non-issue.  Exonerating the State from retroactive liability for remediating a pre-Act toxic discharge, while all others remain jointly and severally liable, does not accord with the Legislature's carefully crafted scheme of allocating fault equitably, in Justice Albin's view.

**CHIEF JUSTICE RABNER AND JUSTICES PATTERSON, FERNANDEZ-VINA, SOLOMON, AND TIMPONE join in JUSTICE LaVECCHIA's opinion.  JUSTICE ALBIN filed a separate, dissenting opinion.**

2

NL INDUSTRIES, INC.,

    Plaintiff-Respondent,

       v.

STATE OF NEW JERSEY,

    Defendant-Appellant.

Argued October 26, 2016 – Decided March 27, 2017

On appeal from the Superior Court, Appellate Division, whose opinion is reported at 442 N.J. Super. 403 (App. Div. 2015).

David S. Frankel, Deputy Attorney General, argued the cause for appellant (Christopher S. Porrino, Attorney General of New Jersey, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel).

Christopher R. Gibson argued the cause for respondent (Archer & Greiner, attorneys; Mr. Gibson and Patrick M. Flynn, on the briefs).

JUSTICE LaVECCHIA delivered the opinion of the Court.

Plaintiff NL Industries, Inc. (NL), filed a claim against the State of New Jersey seeking contribution under the New Jersey Spill Compensation and Control Act (Spill Act), N.J.S.A. 58:10-23.11 to -23.24, for environmental-contamination cleanup costs for a site in the Laurence Harbor region of Old Bridge Township. The claim is based on State activity that occurred

prior to enactment of the Spill Act. NL alleges that the State was responsible for pollutant discharge for two reasons: first, because the State was the owner of riparian land that became contaminated and polluted the Laurence Harbor shoreline; and second, because the State, acting as a regulator through the New Jersey Department of Environmental Protection (NJDEP), approved action related to the property of a third party that similarly is alleged to be responsible for the Laurence Harbor contamination.

The State unsuccessfully sought dismissal of NL's claim. This appeal is before us based on our grant of the State's motion for leave to appeal raising novel questions. The fundamental issue is whether the Spill Act retroactively abrogated the State's sovereign immunity for state action taken prior to the Act's 1977 effective date. If we determine that the State can be liable for its activities during the pre-Spill Act time period, then we must decide two other questions that are presented in this appeal: whether the State can be liable under the Spill Act for actions taken as a regulator; and whether State liability under the Spill Act must be harmonized with the New Jersey Tort Claims Act (TCA), N.J.S.A. 59:1-1 to 12.3, which, among other things, provides the State with immunity from tort claims for certain categories of discretionary activities.

2

There is no dispute in this appeal that, effective with enactment of the Spill Act, the State is responsible under the Act for its discharges because the State is included in the Spill Act's definition of a "person" potentially liable. N.J.S.A. 58:10-23.11b. The contest here centers on whether a series of subsequent amendments made to the Spill Act, which allowed the Act some retroactive application and which created opportunities for private contribution actions, have rendered the State liable for activities that occurred before the Act became effective.

Based on careful review of the Act as enacted and as serially amended, we conclude that the Spill Act contains no clear expression of a legislative intent to waive the State's sovereign immunity retroactively to cover periods of State activity prior to the Spill Act's enactment. Absent a clear and specific indication that the Legislature intended to impose a retroactive liability that could have profound impact on the fiscal affairs of the State, retroactive waiver of the State's sovereign immunity for Spill Act contribution claims concerning pre-Act activities will not be inferred.

Therefore, on the fundamental issue in this appeal, we hold that the State's sovereign immunity prevails against Spill Act contribution claims based on State activities that occurred prior to the original effective date of that Act. The judgment

3

of the Appellate Division is reversed, and this matter is remanded to the trial court for proceedings consistent with the holding of this Court.

## I.

Because this case comes before us on interlocutory appeal from the denial of the State's motion to dismiss plaintiff's complaint, we rely on facts gleaned from the pleadings.[1] This matter is factually and procedurally complex; we recite those facts and procedural steps that are necessary to place the legal issue in context.

## A.

The case concerns the contamination of the Laurence Harbor shoreline, a part of Raritan Bay, in Old Bridge Township (Township). In the early 1960s, the State of New Jersey, along with the Township, retained the services of the United States Army Corps of Engineers (Army Corps of Engineers) to build structures to protect the Laurence Harbor beach from erosion. One such protective measure included the building of a levee and the placement of beach fill on riparian land owned by the State. The Army Corps of Engineers completed the project in 1966.

---

[1] In the posture of this appeal, we treat hospitably all of NL's factual allegations. Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989).

4

In September 1968, Sea-Land Development Corporation (Sea-Land), which had earlier acquired land in Laurence Harbor for development, notified the State of its plans to protect Laurence Harbor from future erosion by the construction of a seawall, which would be made partly with "slag," an industrial byproduct. Sea-Land needed a grant of riparian land from the State in order to construct its wall.

In December 1969, the Natural Resources Council of the NJDEP approved a riparian land grant to Sea-Land subject to several conditions, including that Sea-Land build a beach, consistent with Army Corps of Engineers regulations, and allow public access to the beach. At around the same time, acting through the NJDEP, the State, with the approval of the Township and the Army Corps of Engineers, issued a permit to Sea-Land to build the seawall. Sea-Land accepted the conditions of the riparian grant in 1970 and, thereafter, began construction.

Sea-Land completed the project during the early 1970s, using slag on both the seawall and an existing jetty that the Army Corps of Engineers had constructed during the 1880s. The seawall was situated on land owned by Sea-Land as well as land owned by the State, and the State held, and still retains, an ownership interest in the jetty.

During the construction, a Township official informed the Chief of the NJDEP Bureau of Solid Waste Management that slag

5

was being dumped into Raritan Bay. During the fall of 1972, various divisions of the NJDEP examined the reported information and, in March 1973, the State, the Township, and the Army Corps of Engineers met to discuss the slag issue. At the time, the State acknowledged ownership of some of the land on which Sea-Land built the seawall; from the record, it does not appear that further action was taken at the time.

In 2007, the NJDEP detected contamination along the seawall in Laurence Harbor. The NJDEP reported its findings to the United States Environmental Protection Agency (EPA) in June 2008. The EPA investigated and then, in 2009, placed Laurence Harbor on a national list of contaminated sites. In May 2013, the EPA issued a Record of Decision on the matter, selecting a cleanup and removal remedy for the hazardous material in Raritan Bay, including the Laurence Harbor seawall and jetty, that was estimated to cost $79 million overall.

In January 2014, the EPA[2] demanded that NL, which had operated a factory in Perth Amboy that created slag as a byproduct, remediate the site based on the assertion that Sea-Land had obtained from NL slag used in the Laurence Harbor projects. NL thereafter filed a state court complaint seeking

_____

[2] The EPA acted pursuant to its authority under Section 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C.A. §§ 9601 to 9675.

6

contribution from the State under the Spill Act, alleging that the State caused or contributed to the Raritan Bay contamination in its roles as regulator and riparian landowner.

B.

Procedurally, NL's claim unfolded through motion practice. With discovery not yet completed, the State filed a motion to dismiss NL's claim based on: (1) sovereign immunity; (2) the common law immunities codified in the TCA, as well as the TCA's procedural protections; and (3) NL's failure to state a claim against the State.[3]

The trial court denied the State's motion. NL Indus., Inc. v. State, 442 N.J. Super. 428, 449 (Law Div. 2014), aff'd, 442 N.J. Super. 403 (App. Div. 2015). First, the court determined that the Spill Act provided a clear and unambiguous waiver of the State's sovereign immunity. Id. at 442. The court noted that the State is listed as a potentially liable "person," and that the Legislature did not "immunize or exclude" the State from the list of "persons" from whom a discharger may seek contribution when amending the Act in 1991 to allow for contribution actions. Ibid. For further support, the trial court relied on Department of Environmental Protection v.

---

[3] The State filed an answer and counterclaim later in this matter, after its motion to dismiss was denied by the trial court and while its motion for leave to appeal to the Appellate Division was pending.

Ventron Corp., 94 N.J. 473 (1983), in which Spill Act liability was imposed for the pre-enactment activities of private responsible parties sued by the NJDEP to recover costs expended by the Spill Fund to clean up those private parties' pre-Act discharges. Id. at 441. The trial court cited Ventron for the proposition that this Court has recognized a legislative intent that the Act be applied retroactively. Ibid. Combining the Act's abrogation of sovereign immunity with that interpretation of Ventron's holding, the trial court concluded that the State's sovereign immunity from liability for pre-Act discharges was waived. Id. at 441-42.

Second, the trial court declined to read the Spill Act in pari materia with the TCA and accordingly refused to bar NL's claim based on noncompliance with the TCA's procedural requirements. Id. at 446-47. The court found that the two statutes "were enacted at different times for demonstrably different reasons." Id. at 445. Determining it unnecessary to harmonize the two statutory schemes, the court declined to graft onto the Spill Act the immunities and procedural protections of the TCA. Id. at 446-47.

Finally, the trial court held that NL's factual allegations established a reasonable nexus between the State's conduct and the slag contamination and rejected the State's argument that the complaint failed to state a claim. Id. at 448-49.

On leave to appeal granted to the State, the Appellate Division affirmed the denial of the State's motion in a brief opinion that relied substantially on the reasons set forth by the trial court. NL Indus., Inc. v. State, 442 N.J. Super. 403, 404-05 (App. Div. 2015). We granted the State's motion for leave to appeal from the Appellate Division judgment.

The issues raised in the State's motion for leave to appeal were set forth at the outset of this opinion. The parties' arguments before this Court are substantially the same as those presented to the courts below. To the extent elaboration is required, the arguments are included directly in our analysis of this matter.

II.

We begin with the fundamental statutory question before us -- whether the Spill Act retroactively strips the State of its sovereign immunity for pre-Spill Act activities. To address that question, we turn to the Spill Act's relevant provisions when first enacted and how those provisions are illuminated through the amendments made to the Act.

A.

1.

In 1976, the New Jersey Legislature enacted the Spill Act. L. 1976, c. 141 (codified at N.J.S.A. 58:10-23.11 to -23.24). The innovative nature and breadth of that enactment has been

9

examined by this Court before.  See, e.g., Morristown Assocs. v. Grant Oil Co., 220 N.J. 360, 364-65 (2015) (collecting cases).

From its origin, the Act provided that "any person" responsible for a discharge of a hazardous substance into State waters or onto lands leading to those waters "shall be strictly liable . . . for all cleanup and removal costs."  L. 1976, c. 141, § 8(c).  Section 8 of the original enactment rendered the Act's newly created non-lapsing fund (Spill Fund or the Fund), see L. 1976, c. 141, § 10, strictly liable, without fault, for all costs of cleanup and removal of such discharges and for all direct and indirect damages stemming from the removal of hazardous discharges, L. 1976, c. 141, § 8(a).  Removal and cleanup activities were placed under NJDEP control through Section 7 of the Act.  See L. 1976, c. 141, § 7 (codified at N.J.S.A. 58:10-23.11f).  Section 8 established the liability provisions of the Spill Act (codified at N.J.S.A. 58:10-23.11g).

From its inception, the Act defined "any person" to include "the State of New Jersey."  L. 1976, c. 141, § 3(n) (codified at N.J.S.A. 58:10-23.11b).  The inclusion of the State in the definition of "person" signaled the Legislature's clear intention to include the State as a party responsible for its hazardous discharges and brought about the waiver of sovereign immunity for this new breed of statutory liability that repealed and supplanted previous water-pollution legislation.  See

10

Ventron, supra, 94 N.J. at 494-97 (canvassing history of state anti-water-pollution statutes leading to Spill Act).  The predecessor statute to the Spill Act had not included the State in its definition of a liable "person."  See L. 1971, c. 173, § 3(g) (omitting "State" from "persons" subject to predecessor Water Quality Improvement Act of 1971).

The Act defined "discharge" as an "intentional or unintentional action or omission resulting in the releasing . . . of hazardous substance."  L. 1976, c. 141, § 3(h) (codified at N.J.S.A. 58:10-23.11b).  A unique structure was created for addressing the prompt remediation of hazardous substances discharged "into the waters of the State or onto lands from which [those substances] might flow or drain into" such waters.  Ibid.  The Legislature created a Spill Fund "to finance . . . cleanup of oil spills and hazardous-waste discharges and to compensate" for damages caused by those discharges.  Buonviaggio v. Hillsborough Twp. Comm., 122 N.J. 5, 8 (1991) (citing N.J.S.A. 58:10-23.11a); see id. at 8-10 (describing history of revolving fund established for cleanups and damages and how subsequent legislative alterations expanded its fiscal base).

A Fund administrator controlled disbursements from the Fund and, originally, was authorized to seek reimbursement to the Fund from parties responsible for use of Fund monies for cleanup and removal costs; later, broad responsibility was transferred

to the NJDEP, which became responsible for operation and implementation, as well as protection of the Fund's purse. See generally id. at 9-10. Cleanup and removal costs, placed under the control of the NJDEP, were defined originally in the Act as

> all costs associated with a discharge incurred by the State or its political subdivisions or their agents or any person with written approval from [the NJDEP] in the (1) removal or attempted removal of hazardous substances or, (2) taking of reasonable measures to prevent or mitigate damages to the public health, safety, or welfare . . . .
>
> [L. 1976, c. 141, § 3(d).]

Thus, as initially created, the Spill Act established a scheme by which "most cleanup actions would be conducted by DEP using monies from the Spill Fund where needed." Morristown Assocs., supra, 220 N.J. at 375. The Act made "[t]he fund . . . strictly liable, without regard to fault, for all cleanup and removal costs." L. 1976, c. 141, § 8(a). Section 7 of the Act authorized the NJDEP to draw from monies available in the Fund to remove or to arrange for the removal and cleanup of hazardous substances, and to minimize the damage caused by the discharge. And the Fund administrator, later the NJDEP, was authorized to seek reimbursement to the Fund from parties responsible for the discharge, if the discharger did not clean up his or her own contamination pursuant to a plan approved by the NJDEP.

2.

12

Significantly for purposes of this appeal, the Act's definition of "person" as inclusive of the State has never been altered. The unchanging nature of that term within the Spill Act features prominently in NL's argument in this matter. Because NL's position was adopted by the trial court and the Appellate Division, whose decision we now review, we begin by summarizing NL's arguments.

NL contends that the plain language of the Spill Act's definition of a "person," which includes the State among entities potentially responsible for a hazardous discharge, supports its argument that the State may now be held to be retroactively liable for pre-Act discharges. NL maintains that because the Act has been amended to permit private contribution actions against a potentially responsible party for a discharge that predates passage of the Act, such an action may now be brought against the State like any other "person" liable under the Act. Based on its plain reading of the current version of the Spill Act, particularly its provisions related to contribution actions and the definition of "person," NL contends that the Legislature has authorized a retroactive waiver of the State's sovereign immunity for pre-Act activities by the State that relate to discharges in Laurence Harbor. NL also contends that this Court's opinion in Ventron supports its position.

13

The State, on the other hand, contests the correctness of NL's plain language interpretation. The State further argues that NL misinterprets the meaning of the Legislature's amendments to the Act and how those alterations fit together concerning the State's liability. Also, the State maintains that Ventron is being overextended in NL's argument. Moreover, the State asserts that a retroactive waiver of sovereign immunity is strongly disfavored and requires the clearest of showings to demonstrate such a legislative intent. That clarity of intent is missing here, according to the State.

The merits of the arguments advanced require an evaluation of the series of amendments that are asserted to have authorized retroactive application of State liability under the Spill Act. We next trace the history of the pertinent amendments.

B.

1.

In 1979, the Legislature amended the Spill Act in several important ways.

Section 8 of the Act -- the provision addressing liability -- was amended to impose strict liability on "[a]ny person who has discharged a hazardous substance **or is in any way responsible for any hazardous substance which [the NJDEP] has removed or is removing**" pursuant to Section 7(b) of the 1979

14

amendments.  L. 1979, c. 346, § 5(c) (codified at N.J.S.A. 58:10-23.11g(c)(1)) (new material in bold and underlined).

Section 7 of the Act -- the provision addressing NJDEP authority under the Act -- was modified to clarify the nature of the NJDEP's responsibility for cleanups.  L. 1979, c. 346, § 4 (codified at N.J.S.A. 58:10-23.11f).  With additions in bold and underlined and omissions in angle brackets, the provision was amended to read as follows:

> Whenever any hazardous substance is discharged, the department [i.e., the NJDEP] <shall> **may in its discretion** act to remove or arrange for the removal of such discharge **or may direct the discharger to remove, or arrange for the removal of, such discharge**<, unless it determines such removal will be done properly and expeditiously by the owner or operator of the major facility or any source from which the discharge occurs>. **Any discharger who fails to comply with such a directive shall be liable to the [NJDEP] in an amount equal to three times the cost of such removal**.
>
> [L. 1979, c. 346, § 4(a) (codified at N.J.S.A. 58:10-23.11f(a)(1)).]

The collective effect of those amendments converted the NJDEP's mandatory cleanup duty into a discretionary duty, in practical recognition that the NJDEP could not effectively manage the remediation of all hazardous discharges implicated under the Spill Act.  The amendments enabled the NJDEP to order a responsible party to commence cleanup in its stead.  The trebling of costs, should a discharger fail to comply with the

15

NJDEP's order, incentivized compliance with the NJDEP's expanded range of cleanup options.

In the same set of amendments, the Legislature further amended Section 7 -- again, the section addressing NJDEP authority -- to include a wholly new provision allowing the NJDEP to clean up and remediate spills that occurred prior to the Act's original passage. That 1979 addition addressed, for the first time, a retroactive application of the Act to hazardous discharges that occurred before the Act's enactment. The Legislature inserted this important new authorization for a retroactive application of the Spill Act not into the liability section -- Section 8 of the Act -- but rather into Section 7, thereby amplifying the NJDEP's authority to remediate certain ancient discharges, subject to the availability of Spill Fund monies. The new subsection added the following:

> b. Notwithstanding any other provisions of [the Spill Act], the [NJDEP], after notifying the administrator and subject to the approval of the administrator with regard to the availability of funds therefor, may remove or arrange for the removal of any hazardous substance which:
>
> . . . .
>
> (3) Has been discharged prior to the effective date of the act to which this act is amendatory, if such discharge poses a substantial risk of imminent damage to the public health or safety or imminent and severe damage to the environment.

16

> [L. 1979, c. 346, § 4(b) (codified at N.J.S.A. 58:10-23.11f(b)).[4]]

That latter addition -- clarifying that a retrospective application to the Act was permissible -- constitutes the legislative step that first allowed Fund monies to be used to clean up discharges that occurred before the enactment of the Spill Act.  See Buonviaggio, supra, 122 N.J. at 10 (citing N.J.S.A. 58:10-23.11f(b)(3)).  An accompanying committee statement memorialized the 1979 amendment's aim to "open the fund to ancient . . . spills which pose a threat to the public health and safety."  Gen. Assem. Agric. and Envtl. Comm., Statement to Gen. Assem. No. 3542 (1979).

Thus, the 1979 amendments settled an unresolved question about whether the State was authorized to expend Fund resources remediating discharges that predated the Act's existence.  See Atl. City Mun. Utils. Auth. v. Hunt, 210 N.J. Super. 76, 87 (App. Div. 1986); Dep't of Envtl. Prot. v. J.T. Baker Co., 234 N.J. Super. 234, 247 (Ch. Div. 1989) (noting importance of clarity provided by 1979 amendments to Spill Act), aff'd, 246 N.J. Super. 224 (App. Div. 1991).  Notably, when the Legislature opened up the Fund's use for remediation of spills that occurred

---

[4]  The language in Section 7(b) was later simplified to refer to discharges that occurred "prior to the effective date of P.L. 1976, c. 141."

before the Spill Act was enacted, the Legislature coupled that action with the expansion of NJDEP authority to seek contribution from non-public funding sources:  namely, parties in any way responsible for the discharge that the NJDEP removed or was removing.  See L. 1979, c. 346, §§ 4, 5.  In that pointed way, liability was expanded to permit the State to seek contribution from persons responsible for, among other discharges, those pre-Spill Act enactment discharges that the NJDEP chose to address.  In that manner, retroactivity found express authorization in the Act, but only under N.J.S.A. 58:10-23.11f(b)(3).

## 2.

The other amendment of significance in our analysis occurred in April 1991, when the Legislature revisited the liability section of the Spill Act.  See N.J.S.A. 58:10-23.11g(c)(1).  That amendment is set forth in full, with additions in bold and underlined and omissions in angle brackets to facilitate identification of the alterations to the provision.

> Any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance <which the [NJDEP] has removed or is removing pursuant to subsection b. of section 7 of this act>, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs **no matter by whom incurred.  Such person shall also be strictly liable, jointly and**

18

**severally, without regard to fault, for all cleanup and removal costs incurred by the [NJDEP] or a local unit pursuant to [N.J.S.A. 58:10-23.11f].**

[L. 1991, c. 85, § 4(c) (codified at N.J.S.A. 58:10-23.11g(c)(1)).]

In addition to that amendment, the 1991 amendment expanded Section 7 to permit the expenditure of Fund monies to local governmental units, when acting in an emergency response situation and with the approval of the NJDEP, for the removal of hazardous substances.  L. 1991, c. 85, § 3 (codified at N.J.S.A. 58:10-23.11f(b)); see also id. at §§ 5, 6 (amending N.J.S.A. 58:10-23.11o and -23.11q to permit Fund administrator to seek fund reimbursement in such settings and limiting proof requirements in such actions).  Legislative statements issued in connection with the 1991 amendments primarily focused on a legislative intent to enable municipalities to recover costs in responding to the discharge of hazardous substances; none referred directly to the changes made to N.J.S.A. 58:10-23.11g(c)(1).  See Sen. Envtl. Quality Comm., Statement to Sen. No. 1928 (1990); Gen. Assem. Energy & Env't Comm., Statement to Sen. No. 1928 (1990); Sponsor's Statement to Sen. No. 1928 (1990).

Thus, the legislative history is silent on the relationship between the 1991 amendment and its connection to contribution actions against the State generally, and with respect to pre-Act

19

activities by the State, in particular.  It is debatable from the combination of amendments to the Act in 1991, and accompanying legislative statements, whether the change in the first sentence of N.J.S.A. 58:10-23.11g(c)(1) -- to "no matter by whom incurred" -- signaled a broadly intended opening-up of contribution actions under N.J.S.A. 58:10-23.11f(a)(2)(a) against any and all dischargers, including the State, for hazardous discharges that preceded enactment of the Spill Act. Only the second sentence of this amendment contains a reference to N.J.S.A. 58:10-23.11f, and N.J.S.A. 58:10-23.11f(b)(3) is where one finds the Act's singular reference to retroactive application of Spill Act liability to pre-Act discharges.

III.

A.

Longstanding principles of statutory interpretation favor the prospective application of statutes. Gibbons v. Gibbons, 86 N.J. 515, 521 (1981) (recognizing principle that statutes are presumed to apply prospectively).  Statutes have received retroactive application when:  (1) the Legislature explicitly expressed its intent to have the statute apply retroactively, or impliedly did so because retroactivity is "necessary to make the statute workable"; (2) a curative or ameliorative statute is involved; or (3) the reasonable "expectations of the parties . . . warrant retroactive application of a statute."  Id. at 522-23;

20

see also Twiss v. State, 124 N.J. 461, 467 (1991) (same). The latter two categories of potential retroactive application are not implicated in this appeal.

In the subset of legislative action modifying existing law, a new law is treated as presumptively prospective in application "unless there is an unequivocal expression of contrary legislative intent." Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 95 (1990) (internal quotation marks omitted). In the narrower arena of legislation effecting a waiver of sovereign immunity, the presumption against retroactive application is even stronger due to protective policies pertaining to sovereign immunity.

It is well settled that "the State may not be sued in [its own] courts without its consent." Taylor v. N.J. Highway Auth., 22 N.J. 454, 466-67 (1956) (collecting cases). It is an essential aspect of sovereignty to be free from suit by private citizens seeking money damages unless the State has given its consent, Lodor v. Baker, Arnold & Co., 39 N.J.L. 49, 50 (Sup. Ct. 1876), which requires a clear legislative expression of intent to be subject to suit, N.J. Interstate Bridge & Tunnel Comm'n v. Jersey City, 93 N.J. Eq. 550, 553 (Ch. 1922) (requiring strict construction of statutes in abrogation of sovereign immunity because such statutes "are not permitted to divest the state or its government of any of its prerogatives,

21

rights or remedies, unless the intention of the legislature to effect such object is clearly expressed in the statute"). In other words, a legislative waiver of sovereign immunity must be expressed clearly and unambiguously, Allen v. Fauver, 167 N.J. 69, 77-78 (2001), and a retroactive waiver of sovereign immunity requires the clearest of expression.

This Court has taken care with any retroactive application of the waiver of sovereign immunity when the issue has arisen. Such care was taken, for example, in the seminal case involving the waiver of sovereign immunity from common law tort actions, Willis v. Department of Conservation & Economic Development, 55 N.J. 534 (1970).

In Willis, after years of growing dissatisfaction with application of common law sovereign immunity, this Court announced that it would begin to hear tort liability claims against the State, subject to the Legislature's determination to satisfy the adjudicated claims. Id. at 537-38, 541. In a companion case, the Court similarly determined to entertain contract claims against the State. P, T & L Constr. Co. v. Comm'r, Dep't of Transp., 55 N.J. 341 (1970). The Court observed that the Legislature had been slow to draft a "comprehensive legislative solution" to liability against the sovereign and, therefore, the Court asserted that it was "time for the judiciary to accept . . . responsibility and adjudicate

22

the tort liability of the State itself." Willis, supra, 55 N.J. at 539-40. The Legislature swiftly responded with the TCA and the Contractual Liability Act in 1972. L. 1972, c. 45 (codified at N.J.S.A. 59:1-1 to 14-4).

Notably, in Willis, supra, this Court scrupulously avoided any retroactive application of its holding abrogating sovereign immunity -- to the extent it permitted the adjudication of claims -- by denying that privilege to earlier-in-time claims. 55 N.J. at 541. The Willis Court cited strong fiscal and policy reasons for refusing to allow acceptance of other already existing claims, including that there were no appropriations to pay the obligations or to handle the caseload that might ensue and that the Legislature might wish to enact procedural and substantive limitations on the right to recover; therefore, the Court postponed implementation of its decision, except as to the championing successful plaintiff, for more than eight months to allow the Legislature to act. Ibid.; see also Rochinsky v. Dep't of Transp., 110 N.J. 399, 414 (1988) (considering whether common law immunity for snow removal survived TCA adoption and concluding that "[a]bsent a clear and specific indication that the Legislature intended to impose a liability that could have such a radical impact on the fiscal affairs of public entities," TCA did not establish clear enough legislative expression to have abrogated that protective immunity).

23

B.

We now proceed to determine whether the Legislature clearly and unambiguously intended to abrogate, retroactively, the State's sovereign immunity for activities that occurred prior to enactment of the Spill Act.

It is clear that the inclusion of the State in the definition of "person" subject to the Act when first enacted did not render the State liable for any pre-enactment activities. The Act, as originally passed, did not address discharges that predated enactment.  Although the Legislature did not subsequently alter the definition of "person" to exclude the State despite the amendment to permit private contribution actions for pre-Act discharges, that failure, contrary to NL's argument, does not in and of itself provide any convincing answer to the question of retroactive abrogation of sovereign immunity.[5]  The provisions of the Act must be understood together.  To do that, the amendments must be examined in light of the legislative intent animating the amendments layered onto this complex piece of legislation.

As noted, retroactivity was not introduced into the Act until the 1979 amendments did so, and then only for the limited

---

[5]  Our dissenting colleague's plain language analysis glosses over the central question in this appeal -- namely, whether sovereign immunity was intended to be retroactively abrogated.

24

purpose of augmenting NJDEP authority by allowing the NJDEP to access Spill Fund monies for cleanups of discharges that occurred before the enactment of the Spill Act. Buonviaggio, supra, 122 N.J. at 10. To the extent that the liability section was amended at the same time, we can perceive, clearly, only the following: the Legislature coupled its amendatory "retroactive" action concerning pre-Act discharges, which could now provide a basis for the drawdown of Spill Fund monies, with an expansion of a liability that the NJDEP could pursue to replenish the Fund. Liability was expanded to permit the State to seek contribution from persons responsible for the pre-Spill Act discharges that the NJDEP chose to address.

We fail to see from that combination of amendments in 1979 any basis for establishing any legislative intent whatsoever -- let alone a clear or unambiguous intent -- to abrogate the sovereign immunity otherwise applicable to the State's activities occurring before the Act became effective in 1977.

Nor do the 1991 amendments provide that necessary clarity. There is no trail between the altered language in Section 8's liability provision, deleting reference to the NJDEP's removal of hazardous substances "pursuant to subsection b. of section 7" and adding "no matter by whom incurred," and the contribution section contained in Section 7 (N.J.S.A. 58:10-23.11f(a)(2)(a)), that leads directly to the conclusion that the Legislature was

25

opening the State to contribution actions for its pre-Spill Act activities as landowner or regulator. Such a conclusion must be clearly and unambiguously expressed, and here we do not have anything close to that clarity.

Likewise, the 1991 amendments' legislative statements do not establish that the change in language in the first sentence of N.J.S.A. 58:10-23.11g(c)(1) -- to "no matter by whom incurred" -- conveyed with the necessary precision a legislative intent to open up contribution actions under N.J.S.A. 58:10-23.11f(a)(2)(a) against any and all dischargers, including the State, for hazardous discharges that preceded enactment of the Spill Act. A broad, new, retroactive application for contribution actions involving pre-Act discharges is at odds with, or at the least appears to render redundant, the second sentence to the amendment, which expressly refers to cleanups by the NJDEP or a local governmental unit pursuant to N.J.S.A. 58:10-23.11f. And, as previously noted, only that second sentence refers to N.J.S.A. 58:10-23.11f, and N.J.S.A. 58:10-23.11f(b)(3) is where one finds the Act's singular reference to retroactive application of Spill Act liability to pre-Act discharges.[6]

_____

[6] The dissent's statutory analysis never accounts for this limited, singular reference to retroactivity in the logic of its plain language interpretation.

26

The question is not whether it is arguable that the Legislature passed an amendment that could be construed to provide a pathway to imposing liability on the State in a private contribution action based on the State's pre-Act activities; rather, we must be able to conclude that the Legislature clearly and unambiguously expressed its intention for that result to obtain. We do not find the deliberate clarity necessary to reach that conclusion and therefore part ways with the decisions reached by the trial court and Appellate Division.

C.

To the extent it is relied upon, Ventron, supra, does not lend support to the proposition that the Spill Act subjects the State to retroactive liability for pre-Spill Act activities. 94 N.J. 473.

Ventron's setting was an action brought by the State against private parties responsible for a discharge whose cleanup the State had addressed, notwithstanding that the discharge predated the original enactment of the Spill Act. Id. at 485. In the course of the opinion, the Court tracked the Act's consistency with earlier water-pollution statutes applicable to private parties up through the Water Quality Improvement Act of 1971, which the Spill Act repealed and supplanted, and addressed the 1979 amendment that allowed for

27

retroactive application of liability.  Id. at 494-97.

Critically, the Court noted that the 1979 amendment "imposed strict liability on any person 'who has discharged a hazardous substance or is in any way responsible for any hazardous substance' removed by DEP."  Id. at 494 (quoting N.J.S.A. 58:10-23.11g(c)).  The Court's paraphrase of the closing language to the sentence taken from the 1979 amendment underscored the Court's awareness that the retroactivity was conditioned on that important feature -- it pertained only to those pre-Act discharges that the State cleaned up and sought reimbursement for from private parties.  See id. at 487, 494.  Far from supporting the position taken in this action, Ventron highlights the limited nature of the retroactivity permitted under the 1979 amendment.  The decision in Ventron did not purport to speak to all permutations of retroactive application of the Spill Act.

Post-Ventron, other courts of this State properly have built their holdings carefully from the contextual holding provided by Ventron, avoiding any broad interpretation of the Act based on generalized statements about retroactivity contained in the Court's opinion.  Such decisions have recognized that not all of the Act's provisions are intended to be retroactive.

The Appellate Division considered Ventron's effect on pre-Act claims against the Spill Fund in Hunt, supra, where the

28

Atlantic City Municipal Utilities Authority (MUA) filed a claim against the Spill Fund "to recover cleanup and removal costs incurred because of [an] environmental hazard created" at a landfill adjacent to MUA wells prior to the Act's enactment. 210 N.J. Super. at 78-79, 92. The panel held that the Spill Fund need not reimburse the MUA for its cleanup of the wells because it found "no indication in the Act's history that the Legislature was originally thinking of generally covering discharges which occurred before the existence of the Act," and instead found that "the strict liability provision of N.J.S.A. 58:10-23.11g(a) was prospective except with regard to [NJ]DEP's ability to recover for its cleanup and removal costs incurred in removing hazardous substances discharged before the passage of the Act." Id. at 90, 91 (emphasis added).[7]

Notably, the Hunt panel appropriately rejected the argument that the Ventron "statement that the Legislature expressly intended the Act to be given retroactive effect" meant that "all provisions of the Act should be given retroactive effect"

---

[7]  The Hunt court emphasized the fact that the 1979 Legislature "decided to give [NJ]DEP the power to clean up pre-Act discharges and simultaneously allowed it to recover from the fund" when it added L. 1979, c. 346, § 4 (now codified at N.J.S.A. 58:10-23.11f(b)(3)), and amended L. 1979, c. 346, § 5 (now codified at N.J.S.A. 58:10-23.11g(c)), such that the 1979 amendments were meant to permit only the NJDEP to recover its cleanup costs for pre-Act spills. Hunt, supra, 210 N.J. Super. at 87-88, 92 (emphasis added).

29

because that reading of Ventron takes the statement out of context.  Id. at 93, 94.  See also J.T. Baker Co., supra, 234 N.J. Super. at 242, 246 (finding that Spill Act's penalty provisions did not apply retroactively despite Ventron because Ventron's holding as to one provision "d[id] not mean that the entire statute was intended to have retrospective application," particularly when such retroactivity "would serve no . . . rational purpose"); cf. Handy & Harman v. Borough of Park Ridge, 302 N.J. Super. 558, 565 (App. Div.) (noting that only certain "portions of the Spill Act have been held to be retroactive"), certif. denied, 152 N.J. 10 (1997).

D.

Finally, we note that, although relied upon by NL, amendments made to the Spill Act in 1993 do not shore up NL's position that the Legislature deliberately intended for the State to be stripped of its sovereign immunity and liable for State activities predating the Act's original effective date in 1977.

The 1993 Legislature amended the Act to provide a defense for governmental entities that acquire land "by virtue of [their] function[s] as sovereign[s]" when that land had been contaminated prior to the acquisition.  L. 1993, c. 139, § 44 (codified at N.J.S.A. 58:10-23.11g(d)).  The defense is

unavailable to entities that "caused or contributed to the discharge of a hazardous substance."  Ibid.

That amendment provides no clarity on legislative intent to retroactively impose liability under the Act for actions predating 1977.  The State concedes that it was stripped of its sovereign immunity for conduct occurring since the Act first became effective.  Thus, the State could have acquired property by virtue of its function as a sovereign both before and after the Act's 1977 effective date.  That the Legislature chose to add to the State's defenses for discharges on property that the State subsequently acquired does not address, let alone clearly answer, the question of legislative intent regarding a retroactive stripping of the State's sovereign immunity for pre-1977 liability.[8]

V.

Although our holding rejecting retroactive imposition of liability under the Act on the State for pre-1977 activities answers the fundamental question in this matter, we add the following for completeness.

---

[8]  Although this Court stated in Morristown Associates, supra, 220 N.J. at 381, that N.J.S.A. 58:10-23.11f(a)(2)(a) limits a contribution defendant's "defenses to liability," that limitation does not extend to immunities, as the Act elsewhere separately acknowledges immunities as distinct from defenses. See N.J.S.A. 58:10-23.11g3(d).

The trial court, affirmed by the Appellate Division, discerned no evidence that the Legislature intended to require the State's liability under the Spill Act to be harmonized with the procedural protections provided for claims under the TCA. We agree. As the trial court stated, "[t]he Spill Act and the TCA were enacted at different times for demonstrably different reasons." NL Indus., Inc., supra, 442 N.J. Super. at 445. Because the statutes serve different ends, the trial court determined it would be inappropriate to impose on Spill Act plaintiffs seeking contribution from the State for its affirmative discharges the obligation to satisfy the TCA's notice-of-claim requirements. Id. at 447 n.10 (citing, for additional support, Owens v. Feigin, 194 N.J. 607, 613-14 (2008)). We add that guidance in order to avoid confusion in contribution claims pertaining to State discharges post-enactment of the Spill Act.

Further, the State forcefully argued that the State should not be held liable when exercising its regulatory responsibilities or for its role as a sovereign. See Amelchenko v. Borough of Freehold, 42 N.J. 541, 550 (1964) ("It cannot be a tort for government to govern.").

The State advanced that argument to underscore the absurdity that it perceived would occur were the State held to be retroactively stripped of its pre-Act sovereign immunity and

determined to be potentially liable for discharges into the waters and related lands hundreds of years into the past. The State also relied on that argument to maintain that the liability section, which includes those who are "in any way responsible" for discharges of hazardous substances, should not be interpreted so broadly, and in conflict with the TCA's continued maintenance of immunity for discretionary activities. See N.J.S.A. 59:2-3. We note that plaintiff conceded during oral argument in this matter that the State, when acting as a regulator, cannot be liable for others' discharges.

In light of the fact that the State's regulatory actions in this matter all preceded the original passage of the Spill Act, we add, concededly in dicta, only that we can find no clear evidence in the legislative history of the Act that it was intended to strip the State of immunity for the discretionary governmental activities of a sovereign.

VI.

The judgment of the Appellate Division is reversed, and the matter is remanded to the trial court for proceedings consistent with the holding of the Court.


CHIEF JUSTICE RABNER AND JUSTICES PATTERSON, FERNANDEZ-VINA, SOLOMON, AND TIMPONE join in JUSTICE LaVECCHIA's opinion. JUSTICE ALBIN filed a separate, dissenting opinion.

33

NL INDUSTRIES, INC.,

    Plaintiff-Respondent,

        v.

STATE OF NEW JERSEY,

    Defendant-Appellant.

    JUSTICE ALBIN dissenting.

    Today, the majority holds that the State has no cleanup liability for its discharge of toxic pollutants onto New Jersey's lands before passage of the New Jersey Spill Compensation and Control Act (Spill Act), N.J.S.A. 58:10-23.11 to -23.24.  The majority concludes that only private parties are responsible for cleaning up pre-Spill Act toxic discharges.

    In passing and amending the Spill Act, however, the Legislature made no distinction between the State and private parties as toxic dischargers or owners of contaminated properties.  Both the State and private parties are defined as a "person" for purposes of the Act.  See N.J.S.A. 58:10-23.11b. Under the Spill Act, when the State and private parties are polluters, they have an equal responsibility to remediate contamination that threatens the health of our citizens and the integrity of our environment.  Property contaminated before

1

1977, and not remediated, whether a school ground, a park, or a beach retention wall, is a threat to public health, even when the State is the polluter.

In Department of Environmental Protection v. Ventron Corp., we stated, "the Legislature has expressly declared that the Spill Act should be given retroactive effect." 94 N.J. 473, 498 (1983). We specifically held in Ventron that the Legislature "established retroactive strict liability" against any "person" -- a term that includes the State -- for a hazardous-substance discharge, which the New Jersey Department of Environmental Protection (NJDEP) is cleaning up or has cleaned up. Id. at 497 (citing N.J.S.A. 58:10-23.11g(c)); see also N.J.S.A. 58:10-23.11b. In language that leaves no room for doubt, the Legislature made clear that if the State is a polluter, it is as responsible as any other party for the cleanup costs of a toxic site -- regardless of when the contamination occurred. This clear expression of legislative intent constitutes an unmistakable waiver of sovereign immunity. See Allen v. Fauver, 167 N.J. 69, 74 (2001) (noting that "clear and unambiguous legislative expression" constitutes waiver of sovereign immunity).

The majority's conclusion that only private parties -- and not the State -- can be found at fault for pre-Spill Act discharges is at odds with the statute's plain language, the

2

Legislature's policy objectives, and our decision in <u>Ventron</u>.  I therefore respectfully dissent.

I.

In 1976, the Legislature passed the Spill Act, which provided that "any <u>person</u> who has discharged a hazardous substance shall be strictly liable, without regard to fault, for all cleanup and removal costs."  <u>L.</u> 1976, <u>c.</u> 141, § 8(5)(c) (emphasis added).  The Spill Act's definition of "person" includes "the State of New Jersey and any of its political subdivisions or agents."  <u>L.</u> 1976, <u>c.</u> 141, § 3(n) (codified at <u>N.J.S.A.</u> 58:10-23.11b).  That definition of "person" has not changed during the Spill Act's forty-year history.

In 1979, the Legislature amended the Spill Act, making the State and any other person involved in a toxic discharge jointly and severally liable and subject to contribution.  <u>See</u> <u>L.</u> 1979, <u>c.</u> 346, § 8(5)(c) (codified at <u>N.J.S.A.</u> 58:10-23.11g(c)(1)).  The Spill Act provides that "any <u>person</u> who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, <u>jointly and severally</u>, without regard to fault, for all cleanup and removal costs no matter by whom incurred."  <u>N.J.S.A.</u> 58:10-23.11g(c)(1) (emphasis added).  The Act also provides that "dischargers and persons shall have a right of contribution against <u>all other dischargers and persons in any way responsible</u>" for the

3

discharge.  N.J.S.A. 58:10-23.11f(a)(2)(a) (emphasis added).  In accordance with N.J.S.A. 58:10-23.11f(a)(1), the NJDEP is authorized to "direct [a] discharger to clean up and remove, or arrange for the cleanup and removal of, the discharge."

The 1979 amendment to the Spill Act also included a retroactivity provision, stating that "the [NJDEP] . . . may remove or arrange for the removal of any hazardous substance which . . . [h]as been discharged prior to [April 1, 1977,] the effective date of the act."  L. 1979, c. 346, § 7(b)(3) (codified at N.J.S.A. 58:10-23.11f(b)).  This Court in Ventron, supra, determined that the strict-liability and joint-and-several-liability provision of N.J.S.A. 58:10-23.11g(c) applies to any "person" who has discharged a hazardous substance and is retroactive to the period before passage of the Spill Act.[1]  94 N.J. at 497.  The joint-and-several-liability and contribution principles of Ventron apply here, as well, see N.J.S.A. 58:10-23.11g(c)(1), because the State is a "person" within the intendment of that statute, N.J.S.A. 58:10-23.11b.

The Legislature did not change the definition of "person" in making the Spill Act retroactive, and we have no authority to

---

[1] Ventron involved various private corporate entities that discharged pollutants into Berry's Creek before the effective date of the Spill Act and were held jointly and severally liable without regard to fault under N.J.S.A. 58:10-23.11g(c). Ventron, supra, 94 N.J. at 484-86, 503.

4

do so.  Our charge is to read the Spill Act as it is written.

Because there is no ambiguity about how the Legislature defined

the term "person," there can be no doubt that the Legislature

intended the Spill Act to apply retroactively to the State.  As

a consequence of the Legislature's clear expression that the

Spill Act applies retroactively to the State, sovereign immunity

is a non-issue.

The majority acknowledges that private parties can be

jointly and severally liable for pre-Spill Act discharges and

can seek contribution from another liable party.  Under the

majority's reading of the statute, however, a private party

cannot seek contribution from the State when the State has joint

responsibility for a pre-Spill Act discharge.  That

interpretation leads to the absurd result that when the State

and a private party are both responsible for a toxic discharge,

the private party is on the hook for the entire cleanup cost.

And that is so, even when the State is ninety percent

responsible for a discharge and the private party only ten

percent responsible.  The unfairness of this outcome is all the

more flagrant because the NJDEP can select a site to be

remediated where a private party is required to clean up a toxic

spill primarily caused by the State.

The basic aim of allowing a right of contribution is to

allocate fault so that no party pays more than its percentage of

liability.  See Magic Petroleum Corp. v. Exxon Mobil Corp., 218 N.J. 390, 403 (2014).  This approach accords with basic notions of "equity and natural justice."  Ibid. (quoting Sattelberger v. Telep, 14 N.J. 353, 367-68 (1954)).  The Spill Act allows one discharger to seek contribution from another discharger.  See id. at 405.  The right of contribution under the Spill Act encourages a discharger to remediate contamination promptly and effectively without "fear of bearing the entire cost of cleanup when other parties were also responsible."  Id. at 403.  Exonerating the State from retroactive liability for remediating a pre-Act toxic discharge, while all others remain jointly and severally liable, does not accord with the Legislature's carefully crafted scheme of allocating fault equitably.

Resolving the issue before us does not require interpretive acrobatics.  A straightforward reading of the Spill Act and a simple application of Ventron should have rendered an easy answer to the question of the State's liability.

II.

The State is the trustee of New Jersey's natural resources and is ultimately responsible for ensuring the remediation of toxic contamination of our lands and waters through the Spill Act.  See N.J.S.A. 58:10-23.11a.  The Legislature made clear that the State should not be treated differently from other dischargers of toxic pollutants who have contaminated the

6

environment, regardless of when our lands or waters were despoiled.

Because I believe the majority has misconstrued the Spill Act to reach a result never intended by the Legislature, I respectfully dissent.

7